## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **JOE KLUNDER,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **TRUSTEES AND FELLOWS OF THE COLLEGE** | ) |
| **OR UNIVERSITY IN THE ENGLISH COLONY** | )   **C.A. 10-** |
| **OF RHODE ISLAND AND PROVIDENCE** | ) |
| **PLANTATIONS, IN NEW ENGLAND, IN AMERICA,** | ) |
| **later known as BROWN UNIVERSITY IN PROVIDENCE** | ) |
| **IN THE STATE OF RHODE ISLAND, AND PROVIDENCE** | ) |
| **PLANTATIONS; RUTH SIMMONS (in her individual and** | ) |
| **official capacities; CARLA HANSEN (in her individual and** | ) |
| **official capacities); MARGARET KLAWUNN (in her** | ) |
| **individual and official capacities); TERRY ADDISON (in his** | ) |
| **individual and official capacities); J. ALLEN WARD (in his** | ) |
| **individual and official capacities); RICHARD BOVA (in his** | ) |
| **individual and official capacities); ROBERT ENOS (in his** | ) |
| **individual and official capacities); PHILIP GRUPPUSO)** | ) |
| **(in his individual and official capacities); DAVID** | ) |
| **KERTZER (in his individual and official capacities);** | ) |
| **YOLANDA CASTILLO APPOLLONIO, ESQ (in her** | ) |
| **individual and official capacities); JANE DOE, ESQ (a Brown** | ) |
| **University attorney presently unknown to Plaintiff)(in her** | ) |
| **Individual and official capacities)** | ) |
| | ) |
| **Defendants** | ) |

**CA10 - 410S**

---

## COMPLAINT AND JURY TRIAL DEMAND

### *Nature of the Case*

1.     This is an action brought by a now-graduated student at Brown University.

2.     Its purpose is to seek damages resulting from deprivation of rights afforded to him under

the United States Constitution, specifically the first, fourth, sixth and fourteenth amendments,

and the Declaration of Rights and Principles contained in Article I of the Rhode Island

Constitution.  The cause of action pursuant to these fundamental guarantees is found at 42 USC

1983 and variously under state law.

3.      Further, this action seeks damages under theories of breach of contract, breach of the

obligation of social worker confidentiality pursuant to RIIGL § 5-39.1-1, et seq., false arrest,

false imprisonment, breach of the covenant of good faith and fair dealing, civil conspiracy,

intentional and negligent infliction of emotional distress and negligence, inter alia.  This action

seeks compensatory, exemplary and punitive damages in addition to attorney's fees.

4.      Traditionally, it has been thought that Brown University is immune to constitutional

claims because it is a "private" institution.  This action, however, seeks declaratory judgment

that Brown University is and was in fact a "body politic", a receptacle of delegated sovereignty

and, hence, is subject to the requirement of redemption of due process and other constitutional

guarantees in its dealing with students, staff, faculty and others who find or who have found or

will find themselves under its dominion.

5.      Fundamentally, Plaintiff asks this Court to find that Brown University is not above the

law.

6.      The Plaintiff came to Brown from politically and socially conservative Orange County,

California.

7.      Joe Klunder's personal social and political views reflect his origin.  He is interested in

conservative causes and has affiliated himself with Republican causes.

8.      At Brown, Joe Klunder felt alienated in the midst of a liberal student body, faculty and

administration.

9.      Already psychologically fragile, Mr. Klunder sought assistance from a licensed counselor in the Office of Student Life with the express understanding that, as guaranteed by law, his candor would be confidential.

10.     Rather, because she deemed Mr. Klunder's statements to be "inappropriate", the licensed social worker betrayed Mr. Klunder's trust by reporting his remarks to other Office of Student Life officials as an offense under Brown's standards of conduct.

11.     Thus began the gathering of a series of allegations against Mr. Klunder that, in sum, consisted of nothing more than recitations of what his accusers considered inappropriate remarks in the context of a campus community obsessed with protecting all from being subjectively offended.

12.     To the extent that Mr. Klunder's remarks were inappropriate, his behavior was proximately influenced by medications prescribed for him by Brown's own health service.

13.     This accumulation of objections to the content of Mr. Klunder's speech was solicited and encourage by Brown officials even in light of Mr. Klunder's free speech rights guaranteed not only by the Rhode Island and U.S. constitutions but by Brown University's own professions of commitment to open dialogue.

14.     Ultimately, an allegation against Mr. Klunder to the effect that he had physically threatened another student caused the institution's "judicial" system to spring into action.

15.     Mr. Klunder was evicted from the Brown campus by Office of Student Life agents and the armed Brown Police Department.  He was ordered to remain confined at a local hotel and was summarily whisked back to California on the next available flight.  Mr. Klunder was specifically told that he could not appear on Thayer Street, a public thoroughfare.

16.     Ultimately, the inadequacy and bias of the so-called "investigation" of the allegations against Mr. Klunder were demonstrated by a finding that he was "not responsible" under the threat allegation.

17.     Yet, while the allegation was pending, no referral to any criminal law enforcement agency was made.

18.     Adjudication of the allegations against Mr. Klunder was deficient and unfair in the extreme.   Mr. Klunder was specifically prohibited from having counsel despite the presence of two Brown lawyers at his hearing. Mr. Klunder's only counsel was a dean in the Office of Student Life—an employee of the very Brown unit making allegations against him. Allegations against him were vague and incomprehensible.  Prejudicial and extraneous evidence was admitted.   No effective appeal procedure was available.

19.     The adjudication offered violated Brown's own promises to its students of internal due process.

20.     Ultimately, Mr. Klunder was suspended from Brown for one year with a series of conditions attached to readmission.

21.     While Mr. Klunder was ultimately readmitted and graduated from Brown in the Spring of 2010, he suffered lost income and other significant damages.

22.     The decision of Mr. Klunder's hearing officer was telling.  Although Mr. Klunder has been refused access to any record of his hearing he recalls the hearing officer, a pediatrician from Brown's medical school stating in effect:  We must be kind to those with emotional problems. But, you can't just say what you want.

23.     Mr. Klunder was declared an offender and was penalized, not for a substantive violation of any objective standard of which he had been made aware, but for speaking in a politically

incorrect manner judged, apparently, by the subjective and ill-defined views of those who claim the right not to be offended.

24.     Ultimately, Mr. Klunder was targeted because he was different. Joe Klunder was not of the Brown ilk. His social habits and his politics were different. Because Joe Klunder was different he was offensive. Because he was offensive he was punished.

### Statement of Jurisdiction and Venue

25.     This Court has jurisdiction to hear this matter under its diversity, federal question and pendant claims jurisdiction.

26.     The amount in controversy far exceeds $75,000.00.

27.     Plaintiff is and was, at all times pertinent, a citizen of California.

28.     Defendant Brown is located principally in Rhode Island and is a "body politic" created by the General Assembly of the Governor and Company of the English Colony of Rhode Island and Providence Plantation in 1764.

29.     All other Defendants are citizens of Rhode Island.

30.     The acts complained of herein occurred in Rhode Island.

### Parties

31.     Plaintiff is as previously described herein.

32.     Defendant Brown University is a body politic and corporate formed by the Rhode Island Colonial Assembly and is previously described herein.

33.     Defendant Ruth Simmons is the duly elected President of Brown University who was, at all times pertinent hereto, responsible, with others, for the lawful operation and function of Brown University.

34.     At all times pertinent hereto Defendants Addison, Bova and Ward were employees of Brown University assigned to the Office of Student Life.   They were actively and knowingly involved in the "adjudication" of charges against Joe Klunder including their prosecution and provision of a sham defense.

35.     At all times pertinent hereto Defendant Klawunn was Dean of Student Life and was an employee of Brown University.  As such, she participated in the prosecution of Mr. Plaintiff and perpetuation of the Brown judicial system.

36.     Defendant Kertzer was, at all times pertinent hereto, Provost of and was an employee of Brown University.

37.     At all times pertinent hereto Philip Grappuso was hearing officer responsible for the fair conduct of disciplinary proceedings against Plaintiff.

38.     At all times pertinent hereto Defendant Hansen was an employee of Brown University and also was a Licensed Social Worker subject to the duty of confidentiality.

39.     At all times pertinent hereto Defendant Enos was a sworn peace officer within the meaning of Rhode Island law, was a police officer in the Brown University Police Department and was an employee of Brown University.

40.     At all times pertinent hereto Defendant Yolanda Castillo Appollonio was an employee of Brown University in the Office of Student Life.  Among other responsibilities she is responsible

for "judicial administration".  She is an attorney licensed to practice by the Supreme Judicial Court of the Commonwealth of Massachusetts.

41.     At all times pertinent hereto Defendant Jane Doe, Esq. was an employee of Brown University in the Office of General Counsel.  Her name is presently unknown to Plaintiff.

42.     Defendant Brown has previously consented to suit in this jurisdiction and venue.

*The History of Brown and Applicability of Constitutional Guarantees*

43.     Brown was created as a "body politic" by the Rhode Island General Assembly in February, 1764 when the assembly still functioned as the colonial assembly.

44.     Elsewhere in the charter the institution is referred to as "one body corporate and politic".

45.     The colonial charter further stated that creation of a "public school or seminary" would satisfy certain stated needs of the colony.

46.     The charter granted to the governing body of the new school the right to "regulate, order and govern" and to enact "statutes" and to "make laws".

47.     The charter declares that it is "unalterable"—a position Brown has taken on several occasions when the General Assembly has sought to amend the charter without agreement.

48.     The charter granted to the bicameral governing body of the new school the right to change the school's name.

49.   On September 8, 1803 the Brown Corporation voted to grant what were essentially naming rights to whomever donated $5,000.

50.   A year later Nicholas Brown promised a $5000 donation.

51.   The Corporation immediately voted to change the name of the school to Brown University.

52.   In accord with the provisions of the document, the "unalterable" charter was not changed as a result of the sale of the naming rights.

53.   Despite appearing then to be a private institution the university nevertheless remained a "body politic".

54.   The United States Supreme Court has held that legislation passed immediately prior to passage of the civil rights legislation that is the basis for a portion of this suit extends the requirement to provide constitutional protections to bodies politic.  "The Dictionary Act, which was passed just two months before § 1983 and was designed to supply rules of construction for all legislation, provided that "the word 'person' may extend and be applied to bodies politic and corporate . . . ." Act of Feb. 25, 1871, § 2, 16 Stat. 431."   Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701, 714 (U.S. 2003).

55.   In 1952, the Rhode Island Supreme Court, in a case not involving Brown University defined "body politic" in a manner consistent with the common law of other states. "The term "body politic" is of ancient origin and generally connotes the collective body of citizens exercising political functions of the state. 11 C.J.S. Body, 380. The distinguishing feature of a municipal or quasi-municipal corporation is that it is not only a body   corporate but also a body

politic the components of which, the corporators, are endowed with the right to exercise in their collective capacity a portion of the political power of the state." Kennelly v. Kent County Water Auth., 79 R.I. 376, 380-381 (R.I. 1952).

56.     The "ancient origin" referenced by the Rhode Island Supreme Court in the 1950's was recognized by the United States Supreme Court in 1877 when it expounded on the historical nature of a body politic.  . "A body politic," as aptly defined in the preamble of the Constitution of Massachusetts, "is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." This does not confer power upon the whole people to control rights which are purely and exclusively private, Thorpe v. R. & B. Railroad Co., 27 Vt. 143; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and  has found expression in the maxim sic utere tuo ut alienum non loedas. From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the License Cases, 5 How. 583, "are nothing more or less than the powers of government inherent in every sovereignty, . . . that is to say, . . . the power to govern men and things." Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property..." Munn v. Ill., 94 U.S. 113, 125 (U.S. 1877).

57.     Through its history, Brown University has zealously guarded its delegated rights of sovereignty.   For example, Brown has refused to acknowledge amendments to its Charter enacted without its assent.   And, notably, it has maintained its own police department as distinguished from its internal security guard service.  Brown Police Officers are armed, and have full police powers including the power to arrest, obtain and execute search and arrest

warrants.  Brown Police Officers claim the authority to exercise these powers on the public ways

adjacent to the university campus properties on the East Side of Providence.

*The Contract With Brown*

58.     Brown University has and does publish certain policies and procedures applicable to

students and employees of the university.  These policies and procedures provide for rights,

responsibilities and means of adjudication those rights and responsibilities.

59.     These policies and procedures constitute a portion of the terms in any offer or

employment or acceptance extended to an employee or student.

60.     A contract is thereby formed by acceptance of those policies and procedures by virtue of

matriculation or acceptance of employment.

61.     In 2006 and at other times the university published the following on its website:

> These procedures are not intended to inhibit or restrict free expression or exchange of
> ideas.  The faculty and Corporation, in 1966, adopted the following statement of principle
> regarding academic freedom and freedom of expression:
>
> *Academic freedom is essential to the function of education and the pursuit of scholarship*
> *in universities.  Therefore, Brown University, mindful of its historic commitment to*
> *scholarship and to the free exchange of ideas, affirms that faculty and students alike shall*
> *enjoy full freedom in their teaching, learning, and research.  Brown University also*
> *affirms that faculty and students shall have freedom of religious belief, of speech, of*
> *press, of association and assembly, of political activity inside and outside the university,*
> *to invite speakers of their choice to the campus and that students and faculty as such*
> *should not be required to take any oath not required of other citizens.  The time, place*
> *and manner of exercising these rights on campus shall be subject to reasonable*
> *regulation only to prevent interference with the normal functions of the university.*

...In an academic community the response to ideas believed to be distasteful or offensive should be other ideas and relevant evidence rather than administrative sanctions.

62.     On February 1, 2005, even as the Office of Student Life was beginning its harassment of Mr. Klunder for his "inappropriate" remarks, Brown President Ruth Simmons was reinforcing the university's professed policy of guarantee of free speech during the opening of the Spring semester.  She commented and queried:

> There is a chilling effect caused by the dominance of certain voices on the spectrum of moral and political thought.

> Why do so many hold up Brown as an example of the way that universities today circumscribe free expression?

> A reasoned challenge to a perspective is the most important obligation of scholarship.

> The duty to enter debates lies with students themselves.

> Unchallenged opinion is a dark place that must be exposed to light.

63.     The Standards of Student Conduct guarantee to all members of the "University Community" the free exchange of ideas.

64.     The Principles of the Brown University Community includes "intellectual inquiry through vigorous discourse, both oral and written."

65.     Brown's Non-Academic Disciplinary Procedures include certain procedural rights which, in the case of Mr. Klunder, were not provided or which are, inherently, unfair and violative of the Covenant of Good Faith and Fair Dealing:

> Failure to be informed in writing of the charge(s) and alleged misconduct with specificity.

> Failure to exclude inflammatory and otherwise prejudicial evidence.

*Failure of availment of a hearing at which any semblance of the rules of evidence are applied.*

*Failure to be assumed not responsible of any alleged violations unless found through the appropriate disciplinary hearing and appeal*

*To be required to have an advisor at hearing who is not an attorney.*

*To be precluded from being advised by counsel.*

*To be precluded from raising procedural and substantive due process objections and arguments by virtue of appointment of a compromised advisor.*

*To be afforded confidentiality only if in accord with University practices.*

*To have an effective and meaningful appeal procedure*

*To be denied the right to refrain from providing information that is self-incriminating.*

*To be required to accept adjudication not open to attendance by members of the press or university community at the option of the alleged offender.*

*For witnesses to be unsworn.*

*For university lawyers to be present at hearing while the alleged offender is not allowed counsel.*

*To be deprived of a record of the proceedings.*

*Other Facts*

66.  Plaintiff Klunder resides with his family in Orange County, California.

67.  He began his collegiate education at Brown University during the 2003-2004 academic year.

68.     As he began school he was highly stressed owing to illness in his immediate family and his mother's opposition to him going to Brown.  Additionally, Mr. Klunder was having difficulty adjusting to the politically and socially liberal Brown community.   He is politically and socially conservative.

69.     Mr. Klunder began the school year at around 150 pounds.  He quickly lost another 25 pounds due to stress.

70.     During the 2004-2005 academic year Plaintiff sought help from the Brown medical staff.  As a result he was medicated and was referred for psychiatric counseling.

71.     During the Spring, 2005 semester Mr. Klunder's grades began to slip.  He had received all A's during his first three semesters at Brown.

72.     One of the drugs which had been prescribed for him by the Brown medical staff was causing him to feel inebriated.  He was taken off the drug—Klonopin—after he began to make socially inappropriate remarks. Among the published side effects of Klonopin are unual thoughts or behavior, hyperactivity, agitation and hostility.

73.     Plaintiff was then given a new prescription of Adderall by the Brown medical staff working at Butler Hospital.

74.     The new drug seemed to help.  Mr. Klunder gained weight, was not depressed and generally felt restored to his former personality.

75.     However, as he began use of Adderall, Mr. Klunder's odd social interactions were exacerbated, particularly when he ingested caffeine.

76.     According to the Food and Drug Administration, Adderall is an amphetamine approved for use in the treatment of forms of attention deficit disorder.

77.     Unknown to Plaintiff, as Brown prescribed Adderall public health authorities were taking action to restrict its use.  In January, 2005 Canadian drug authorities suspended the sale of Adderall in that country.   The U.S. Food and Drug Administration issued a drug advisory.

78.     The concern about Adderall arose from reported side effects including psychiatric ramifications.

79.     Joe Klunder was not told about these concerns by the Brown medical staff.

80.     In fact, aware of the elation he was experiencing when he ingested caffeine, Mr. Klunder reported the side effects to his Brown physicians.   No concern was expressed and the medication continued.

81.     Seeking additional help from Brown, Plaintiff visited the Office of Student Life on April 29, 2005.  He sought counseling from Dean Carla Hansen known to him to be a licensed social worker.

82.     Concerned about confidentiality, Mr. Klunder sought confirmation that his conversation with Hansen would not be disclosed.  According to Dean Hansen's own report she replied that if she believed Mr. Klunder was a danger to himself of others she would have to divulge the conversation.  Hansen later reported that she told Mr. Klunder that Brown confidentiality standards were different than those imposed on her by her profession: "I said that our standards were actually more inclusive than the narrow limits of psychotherapy, to which he was referring,

and that there were actually a number of things that I could be obligated to address as a result of our talking."

83.    Mr. Klunder then began to confide that he was uncomfortable at Brown in part because of his lack of experience in dealing with gays.

84.    Dean Hansen then divulged to Mr. Klunder that she is a lesbian.

85.    Mr. Klunder responded by asking Hansen about homosexual experiences and by telling Hansen about some of his recent awkward social interactions.  He expressly told her about his prescribed use of Adderall and its side effects.

86.    At the end of the session Dean Hansen provided web references to sources about homosexuality.   And, she later acknowledged, Mr. Klunder "…may have tried to apologize".

87.    Following the ensuing Memorial Day weekend on May 5, 2005 Dean Hansen wrote a report which she ultimately disseminated to Brown officials prosecuting Mr. Klunder.

88.    On May, 25, 2005 Mr. Klunder went to lunch at the Paragon restaurant on Thayer Street in Providence.  He encountered employees of Brown Career Services sitting near him.

89.    According to a report later used against Mr. Klunder he initiated a conversation by commenting on the attractiveness of their desserts.  He then went on to say that he recognized them and to tell them about his weekend including the fact that he had had a lot to drink one evening and had made a series of telephone calls to his girlfriends.  The women noted in their report that they did not feel threatened and did not try to "solicit" them in any way.  Rather, Klunder's conduct was described as "inappropriate".

90.    On June 17, 2005 Terry Addison, Associate Dean of Student Life, wrote to Mr. Klunder

at his California home.  The letter informed that Addison had received a complaint and "several

reports of you making inappropriate, sexually harassing comments, (sic) during this past

semester."  The letter continued by instructing Mr. Klunder to make an appointment to meet with

him for a "dean's hearing".   At the hearing, he advised, Addison would determine "whether or

not you committed the following offense:

Offense IV: Subjecting another person or group to abusive, threatening, intimidating, (sic) or
harassing actions, including, but not limited to, those based on race, religion, gender, disability,
age, economic status, ethnicity, national origin, sexual orientation, gender identify or gender
expression."

91.    Prior to this time Mr. Klunder had no indication that his behavior had violated any Brown

standard.

92.    Even upon receipt of Addison's letter Mr. Klunder was not given notice, with specificity,

of the acts alleged to have constituted violative conduct.

93.    Shaken by Brown's treatment of him, Mr. Klunder then decided to take a leave of

absence from Brown.

94.    Desirous of an Ivy League diploma and feeling able to deal with the atmosphere, Mr.

Klunder returned to Brown in the Fall of 2007.

95.    On or about September 9, 2007 Mr. Klunder was awakened in the early morning hours by

loud noises and what he perceived to be violent behavior by other students—members of Sigma

Chi fraternity.

96.     On September 10, 2007 Mr. Klunder encountered several members of the fraternity in a university dining hall. There, he initiated conversation with them and related his overnight experience.

97.     During the conversation Mr. Klunder mentioned that the perpetrators of the fraternity disturbance were African-Americans. He further stated that he was concerned that someone would be stabbed during an altercation in expressing his fear.

98.     Jumping to conclusions, one of the students with whom Mr. Klunder had spoken at the dining hall reporting the conversation while interpreting Mr. Klunder's statements as a threat to African-Americans.

99.     On the same day Dean Addison wrote to Mr. Klunder saying he had a report that Plaintiff had threatened one of the fraternity members at the dining hall. No mention was made of alleged threats to the African-American students although that was eventually the allegation reported in writing to Dean Addison.

100.    On September 12, 2007 the rush to judgment approached warp speed. First, Dean Addison wrote to Mr. Klunder repeated the allegation that a student had been threatened with stabbing. While indicating that an investigation would ensue he noted that the new "charges" would be in addition to the 2005 charge of "Offense IV" now apparently reactivated. The new "charges" were a second count of "Offense IV" and a new count: "Offense II.b: Actions that are unreasonably disruptive of the University community and/or its neighborhoods."

101.    In fact, despite the promise of full investigation, no attempt was made to corroborate statements made by so-called "witnesses". The entire "investigation" consisted of submission of unchallenged, conclusory and uncorroborated statements made against Mr. Klunder. The written

materials, in the form of emails and completed forms, all contained extraneous, irrelevant, inflammatory and prejudicial materials which were subsequently presented to a finder of fact completely untrained in the law.

102.    Also on September 12, 2007, Mr. Klunder went to the Office of Student Life to examine his file. While there, he saw, for the first time, the allegations that had been made against him in 2005 by Dean/social worker Carla Hansen and others. Now very concerned, Mr. Klunder began to demand a lawyer. He was then approached by Attorney Yolanda Castillo Appollonio who is responsible for "judicial administration" at the Office of Student Life. Attorney Appollonio informed Mr. Klunder that he was not entitled to an attorney and could not have one because Brown is a "private institution".

103.    Mr. Addison's September 12, 2007 letter also specifically and expressly informed Mr. Klunder that he could not be represented by a lawyer.

104.    Mr. Addison's letter also instructed Mr. Klunder that he, Addison, had been designated to "advise you regarding hearing procedures".   Thus, the "investigator" would also be a procedural advisor to the respondent.

105.    The letter also ordered Mr. Klunder to provide a list of all witnesses and others with knowledge of the facts of the case to the Office of Student Life. By so doing, Mr. Addison assigned to Mr. Klunder the obligation of providing inculpatory witnesses whose testimony would be used against him at hearing.

106.    At no time was Mr. Klunder given notice of the specifications against him or any amplification or explanation of the vague, overbroad and ambiguous "offenses" with which he was being charged.

107.    Also on September 12, 2007 Margaret Klawunn notified Mr. Klunder in writing that he was being ejected from Brown property, including his living and sleeping accomodations" pending "the outcome of any investigation conducted by this office." Mr. Klunder was told in the letter that the ejectment was undertaken "…for your best interests and those of the community."

108.    Also on September 12, 2007 shortly after 4:30 PM, Sergeant Robert Enos of the Brown University Police was instructed to meet Dean Allen Ward and Dean Richard Bova, both of the Office of Campus Life, to the Wayland Arch on the Brown campus.

109.    There, Sergeant Enos was told by Dean Ward that Mr. Klunder was being ejected from the campus and from his housing because of a statement that he was going to stab "someone". He further stated that Mr. Klunder was being taken to the Radisson Hotel on Gano Street and could not return to the campus.

110.    At the time Sgt. Enos was armed and was wearing a police uniform.

111.    Dean Addison and Dean Ward, with the police officer, escorted Mr. Klunder to the police cruiser. Mr. Klunder was ordered into the cruiser and was repeatedly told that he must accompany the officer to the hotel and must remain in the hotel until he departed for California in the morning.  Dean Ward, Mr. Klunder and Sgt. Enos entered the cruiser.

112.    At no time was Mr. Klunder given or shown any evidence of legal process, judicial ejectment, restraining order, arrest warrant or anything else that provided authority for the seizure of Mr. Klunder.

113.    During the ride to the hotel Mr. Klunder again was told that he could not visit with his friends and could not appear on Thayer Street, a public thoroughfare not part of the Brown campus. He was further told that he must remain at the hotel and must leave on a plane in the morning which would take him home to California.

114.    Also, during the ride Mr. Klunder noted during the conversation that Sgt. Enos was armed and stated that he intended to legally pursue those who had falsely accused him.

115.    In his official report of the incident, without any reference to any training that would provide qualification for such a statement, Sgt. Enos stated that it was his opinion that "…Klunder was very cool, calculating and manipulative."

116.    The entire police report, including Sgt. Enos' psychological observations, was eventually admitted in the proceedings against Mr. Klunder.

117.    In November, 2007, the Brown Office of Student Life conducted a hearing into the accusations against Mr. Klunder.

118.    Previously Mr. Klunder was given a list of potential advocates, all of whom were employees of Brown.

119.    Eventually the Office of Student Life assigned Dean Richard Bova to counsel Mr. Klunder. Mr. Bova is an employee of Brown within the Office of Student Life and, thus, was under control and dominion of the same university unit prosecuting Mr. Klunder. Mr. Bova has no legal training or experience.

120.    On November 11, 2007 Mr. Klunder sent an e-mail to Mr. Addison making what, in essence, were discovery requests. There was no substantive response.

121.    The hearing was conducted in a small room in the Office of Student Life.

122.    The hearing officer was   Dean Philip Grappuso of the Brown medical school.  Dr.
Grappuso is a pediatrician with an undergraduate degree in the arts, concentrating in music.  He
has no legal training or experience.

123.    Despite Mr. Klunder being denied legal counsel Brown was represented by two attorneys
at the hearing.  The first was Defendant Appollonio.  The second was Defendant Jane Doe.  Both
advised the hearing officer and others.

124.    The remaining people in the room were all employees of the Office of

Student Life.  These were Defendants Ward, Bova and Addison.  It is also possible that

Defendant Klawunn was present for all or part of the hearing.

125.    Thus, Joe Klunder faced a hearing alone populated by Brown employees, most of whom
were employees of the Office of Student Life or its legal representatives.

126.    Joe Klunder's defense, orchestrated by Defendant Bova, was a sham.  No exculpatory
witnesses were called.  No effective cross examination of inculpatory witnesses occurred.  The
entire defense consisted of arguments that Mr. Klunder was "a little out of it" and had "no malice
in his heart."   There was no challenge to the manifest and abundant procedural flaws or to the
inept and inchoate "investigation".

127.    Nor was there any protest of the denial of legal counsel for Mr. Klunder nor of the
presence of two attorneys representing Mr. Klunder's accusers.

128.    There was no motion concerning lack of proper notice to Mr. Klunder as to specifications
or regarding the ambiguity and overbreadth of the "offenses" with which he was charged.

129.    The hearing officer, too, did nothing to prevent the substantive and procedural due process defects so obvious in the treatment of Mr. Klunder.

130.    After the hearing was concluded Defendant Klawunn advised Mr. Klunder that he had been found responsible for violation of all of the charges against him except for "Offense IV"— the alleged threat to stab another student.

131.    Specifically, according to Defendant Klawunn, Defendant Grappuso imposed the following sanction:

You are placed on Suspension until spring 2009. That is, you would be eligible to reenroll for the spring semester of the 08-09 academic year. (Suspension is separation from the University for a designated period of time after which the suspended student may petition the Associate Vice President for Campus Life/Dean of Student Life for readmission to the University.) The petition must demonstrate that the student has satisfied any accompanying terms of the suspension. A student who has been suspended may not be on University property without the prior approval of the Associate Vice President for Campus Life/Dean of Student Life. A suspended student is prohibited from participating in any University activity or program.
Additionally, the following are the accompanying terms of your suspension:
1. Transcript entry (A transcript entry is a notation on a student's official University transcript).
2. During your suspension, we expect that you will receive on-going counseling, and a letter from your therapist supporting your readiness to return will need to be submitted.
3. Re-enrollment is dependent on documentation from a University approved psychiatrist attesting to the fact that you are ready to return.
4. Letter of recommendation from a non-relative employer/volunteer leader that you have been able to function appropriately as part of a community (work/volunteer) for the duration of at least six months is required.
5. No contact with any members of the Brown community unless the contact is for official business and approval has been granted by the Office of Student Life. Any contact outside of approved business-related communication with Brown students, faculty, or staff will be considered a violation of the terms for your suspension and will increase the length of your suspension.
Only when you are able to appreciate the consequences of your words and actions, refrain from disruptive and harassing behavior, and function as a member of the University community will you be allowed to return. If upon your return you begin to exhibit similar behaviors, you would likely face expulsion from the university.

132.   Following the hearing Mr. Klunder asked Defendant Addison for a copy of the record of the hearing.   He was told that the only record was a tape recording and that copies were not provided.

133.   In February, 2008 counsel for Mr. Klunder attempted to contact Defendant Bova to discuss Mr. Klunder's hearing and the charges against him.   He did not return several telephone calls.

134.   On February 23, 2008, counsel for Mr. Klunder wrote to Defendant Klawunn asking for the "full record" of the proceedings against Mr. Klunder including "all documents assembled in connection with the investigation of the complaints filed against my client including but not limited to notes and reports."   Dean Klawunn did not respond.

135.   At no time was there any explanation provided as to why, if the allegation of a threat to stab another was taken seriously, the matter was not referred to a police agency under RIGL § 11-45-1 which proscribes threatening conduct.

136.   Mr. Klunder thereupon perfected his rights of appeal pursuant Non-Academic Disciplinary Procedures published by Defendant Brown.

137.   Despite such perfection, Defendant Kertzer, responsible for processing such appeals, failed to respond in any faction.

138.   Defendant Simmons supervises Defendant Klawunn.   Defendant Simmons failed to supervise, train and/or control Defendant Klawunn and her subordinates.

139.   Defendant Simmons is responsible for supervision of the entire Brown judicial system and failed to properly insure the effective, fair and lawful function of such system.

*Statement of Claims*

### Count One -- Declaratory Judgment

### (against all Defendants)

140.     Plaintiff incorporates all previous averments herein.

141.     Plaintiff seeks declaratory judgment that:

*Brown University, its agents and employees are "persons" within the meaning of 42 U.S.C. 1983.*

*Brown University, its agents and employees are, and have been since February 25 1871, subject to the provisions of the First and Fourteenth Amendments to the United States Constitution.  Article I of the Rhode Island Constitution, 42 U.S.C. 1983 and other implementing statutes.*

*As such, Brown University, its agents and employees act, and have acted since February 25, 1871, under color of law.*

### Count Two -- Violation of 42 U.S.C. 1983

### (against all Defendants)

142.     Plaintiff incorporates all previous averments herein.

143.     At all times pertinent hereto, Defendants acted under color of law.

144.    In so doing, Defendants deprived Plaintiff of guaranteed rights under the First, Fourth

Sixth and Fourteenth Amendments to the United States Constitution and Article I of the Rhode

Island Constitution.

145.    Such deprivation included but is not limited to rights to: freedom of speech, substantive

due process, procedural due process, freedom from unreasonable seizure of property, freedom

from unreasonable seizure of person, right to counsel.

146.    By such conduct Plaintiff was harmed by loss of income, loss of employability, infliction

of emotional distress and other losses to be proven at trial.

### Count Three -- Violation of 42 U.S.C. 1983

### Failure to Supervise and/or Train

### (against Defendants Brown University and Simmons)

147.    Plaintiff incorporates all previous averments herein.

148.    At all times pertinent hereto, Defendants acted under color of law.

149.    Defendants failed to adequate supervise and/or train their subordinates in order to protect

the rights of students and others in the exercise of their duties under color of law.

150.    In so doing, Defendants deprived Plaintiff of guaranteed rights under the First, Fourth

Sixth and Fourteenth Amendments to the United States Constitution and Article I of the Rhode

Island Constitution.

151.   Such deprivation included but is not limited to rights to: freedom of speech, substantive due process, procedural due process, freedom from unreasonable seizure of property, freedom from unreasonable seizure of person, right to counsel.

152.   By such conduct Plaintiff was harmed by loss of income, loss of employability, infliction of emotional distress and other losses to be proven at trial.

## Count Four -- Civil Conspiracy

### (against all Defendants)

153.   Plaintiff incorporates all previous averments herein.

154.   Defendants did intentionally and knowingly combine, confer, conspire and agree for an improper and/or unlawful purpose.

155.   Such combination, conference, conspiracy and agreement was for the purpose of establishing and maintaining a judicial system at Brown University violative of rights guaranteed by the United States and Rhode Island Constitutions.

156.   By such conduct each Defendant acquired vicarious liability for the acts of each and every other Defendant.

157.   By such conduct Plaintiff was harmed.

## Count Five -- Breach of Contract

## (against Defendant Brown University only)

158.    Plaintiff incorporates all previous averments herein.

159.    Defendant did materially breach the contract formed between and among it and its students by denying and impeding Plaintiff's exercise of his constitutional rights including but not limited to the right of free and open expression and speech.

160.    Defendant further materially breached the same contract by denying and depriving Plaintiff of contractually guaranteed rights of procedural and substantive due process.

161.    By such breach Plaintiff was harmed.

## Count Six -- Breach of the Covenant of Good Faith and Fair Dealing

## (against Defendant Brown University only)

162.    Plaintiff incorporates all previous averments herein.

163.    Defendant did materially breach the implied covenant of good faith and fair dealing within the contract between and among its student and Defendant.

164.    Defendant committed such breach by interfering with Plaintiff's enjoyment of the benefit of his bargain with Brown University and by treating him unfairly and acting in bad faith in administration of the Brown judicial system.

165.    By such breach Plaintiff was harmed.

## Count Seven -- Intentional and/or Negligent Infliction of Emotional Distress

### (against all Defendants)

166.   Plaintiff incorporates all previous averments herein.

167.   By their conduct Defendants did intentionally and/or negligently inflict emotional distress upon Plaintiff.

168.   Such infliction exacerbated Plaintiff's already fragile emotional state.

169.   Defendants knew of or should have known of such fragile emotional state.

170.   Resultingly, Plaintiff suffered physical manifestations of such distress including anxiety, depression and sleeplessness.

171.   Plaintiff was further and otherwise harmed by such infliction.

## Count Eight -- False Arrest

### (against Defendants Brown University, Addison, Ward. Enos and Klawunn)

172.   Plaintiff incorporates all previous averments herein.

173.   Defendants did by affirmative direction, persuasion, request or voluntary participation cause the arrest and detention of Plaintiff.

174.   Such arrest was unlawful.

175.   Such arrest was without probable cause.

176.   Such arrest was without process of law.

177.   By such conduct, Plaintif was harmed.


## Count Nine -- False Imprisonment

### (against Defendants Brown University, Addison, Ward. Enos and Klawunn)

178.   Plaintiff incorporates all previous averments herein.

179.   Defendants did by affirmative direction, persuasion, request or voluntary participation cause the arrest, imprisonment and detention of Plaintiff.

180.   Such imprisonment and detention was without the consent of Plaintiff.

181.   Such imprisonment and detention was without legal process.

182.   By such conduct Plaintiff was harmed.


## Count Ten -- Negligence

### (against Defendants Simmons, Kertzer, Klawunn and Brown University)

183.   Plaintiff incorporates all previous averments herein.

184.   Defendants owed a duty of care to Plaintiff to fairly, completely and impartially cause investigation of allegations made against him.

185. Defendants further owed a duty of care to provide fair and impartial adjudication of those allegations.

186. Defendants further owed a duty of care to supervise, train and control their subordinates.

187. Defendants breached such duties.

188. Such breach was the actual and proximate cause of harm suffered by Plaintiff.

189. Plaintiff did, in fact, suffer such harm.


**Count Eleven -- Breach of the Duty of Confidentiality and Loyalty**

**(against Defendant Carla Hansen only)**

190. Plaintiff incorporates all previous averments herein.

191. Defendant, in counseling Plaintiff, owed Plaintiff the duty of confidentiality as a licensed clinical social worker.

192. Defendant, without permission, excuse or immunity, breached such duty by disclosing, in writing and orally, the content and substance of statements made to her in her role as counselor.

193. Such breach violates the provisions of RIIGL § 5-39.1-1, et seq.

194. Such breach further violates the common law duty of confidentiality and loyalty owed by Defendant to Plaintiff.

195. By such breach Plaintiff was harmed.

*Jury Trial Demand*

Plaintiff herewith claims his right to trial by jury on all issues so triable.


*Prayer for Relief*

Plaintiff demands the following relief:

1.  Judgment on all counts,

2.  Award of compensatory, punitive, exemplary, multiple and other damages as allowed by law,

3.  Award of reasonable attorneys' fees,

4.  Such other relief as the Court deems just and proper.

PLAINTIFF JOE KLUNDER

BY HIS ATTORNEYS


/s/ Leon A. Blais (MA BBO #652595)

_____

Leon Blais, Esq. (Pro Hac Vice Pending)

BLAIS & PARENT

20 Cabot Blvd., Suite 300

Mansfield MA 02048

508-618-1280



/s/ Philip E. Irons (RI Bar #4717)

_____

Philip E. Irons, Esq.

650 Washington Hwy., Suite 201

Lincoln, RI 02865

401-333-0100